**FILIPINO AMERICAN VETERANS AND DEPENDENTS ASSOCIATION et al., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

**No. 72 785 WTS.**

United States District Court, N. D. California.

Nov. 14, 1974.

W. Urie Walsh and Peter J. Donnici, San Francisco, Cal., for plaintiffs.

James A. Browning, Jr., U. S. Atty., and Richard F. Locke, Asst. U. S. Atty., San Francisco, Cal., for defendants.

Before KILKENNY,* Circuit Judge, and EAST and SWEIGERT, District Judges.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a class action brought by a Filipino Veterans Association and certain named plaintiffs, formerly residents of the Philippines but all of them now residents of California and three of them now citizens of the United States, claiming to be World War II Veterans or spouses of World War II veterans, and as such entitled to veterans' benefits provided under the laws of the United States.

The action is brought against the Director of the Veterans Administration and other officials of the United States for the purpose of enforcing plaintiffs' claims and, as an incident thereto, to obtain a judgment declaring that a certain federal statute, Title 38 U.S.C. § 107,

* JUDGE KILKENNY, dissents.

which purportedly prohibits or restricts veterans' benefits as to plaintiffs, is an unconstitutional denial of the law.

The case is now before the court on defendants' motion to dismiss and plaintiffs' motion for a partial summary judgment on the issue of constitutionality. The record consists of the Amended Complaint and an Agreed Statement of the Material Facts.

## THE STATUTE

Title 38 U.S.C. § 107, provides (sub. (a)) that "service before July 1, 1946, in the organized military forces of the government of the Commonwealth of the Philippines while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President, dated July 26, 1941 . . . shall not be deemed to have been active military, naval or air service for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the Armed Forces *except* benefits under "Chap. 11 (compensation for service-connected disability or death); except Sec. 412(a), Chap. 13 (compensation for dependents for service-connected disability or death); and Chap. 23 (burial benefits); also excepted were benefits under pre-1946 National Life Insurance contracts.

The statute also provides that payments of the allowed compensation for service-connected disability or death "shall be made at a rate in pesos as is equivalent to 0.50 for each dollar otherwise authorized." [1]

This statute, Title 38 U.S.C. § 107, is essentially the same as certain 1946 predecessor legislation on the same subject matter (Title II of Public Law 301, 79th Congress, 60 Stat. 14, entitled First Supplemental Recision Act of 1946 (as to sub. (a)) and (as to sub. (b)) Public Law 391, 79th Congress, 60 Stat. 223, entitled Second Supplemental Recision Act of 1946)—to which 1946 legislation we will hereinafter make further reference.

The practical effect of the challenged legislation has been to limit the Filipino servicemen described in the legislation (and their beneficiaries) to compensation for *service-connected disability or death* (and payments under certain *pre-1946* National Life Insurance contracts) and, further, to limit the allowed compensation for service-connected disability to 50% of the monetary amount to which veterans in the United States have been entitled. Denied to the Filipino veterans were other, additional veteran benefits available in 1946 and since to veterans in the United States, e.g., certain life insurance, medical, hospitalization, educational, vocational rehabilitation, civil service credit, longevity pay, retirement, pension and annuity benefits.

## BACKGROUND OF THE PHILIPPINES

In order to understand this legislation we must bear in mind that the Philippine Islands had been ceded by Spain to, and became a territory of, the United States under the 1898 Treaty of Paris.

On March 24, 1934, the Congress had passed the Philippine Independence Act, Public Law 73–127, 48 Stat. 456, providing for eventual Philippine independence and creating, meanwhile, a Commonwealth of the Philippines vested with certain powers over its own internal affairs.

It was not until July 4, 1946, however, that this interim Philippine Commonwealth received its grant of independence by a Presidential Proclamation of that date in fulfillment of the promise contained in the Act of 1934.

---

1. The statute similarly provides (sub. b) that "Service in the Philippine Scouts under section 14 of the Armed Forces Voluntary Recruitment Act of 1945 shall not be deemed to have been active military or air service for the purpose of any laws administred by the Veterans Administration"—with substantially similar exceptions.

During the 12-year interval between the Act of 1934 and final independence in 1946, the Philippines were in what has been described as a "unique" status. Although not in all respects a "foreign" territory, the Philippines were treated by the Act of 1934 as a foreign country for many purposes, e.g., Filipino citizens were treated as aliens for immigration purposes; also foreign service officers assigned to the Philippines were treated as if stationed in a foreign country; also the Act of 1934 defined "United States" as excluding the Philippines. See, Hooven v. Evatt, infra, 325 U.S. 677–8, 692, 65 S.Ct. 870.

Nevertheless, the United States retained plenary and unrestricted power over the Philippines until its sovereignty over them was formally withdrawn in 1946. (Id. p. 692, 65 S.Ct. 870).[2] Among other things, the Act of 1934 reserved to the United States the power (Sec. 2(a)(12)) to maintain military bases and armed forces in the Philippines and, upon order of the President of the United States, the right "to call into the service of such armed forces all military organized by the Philippine government."

It was under that authority that President Roosevelt, by an Executive Order of April 26, 1941, did call the then existing military of the Philippine government "into the service of the armed forces of the United States all military organized by the Philippine government" for the period of the imminent World War II emergency and placed that military under the command of general officers and commandants of the United States Army and Navy.

The named plaintiffs in this action, or their spouses, were among the Philippine military called into the service of our armed forces pursuant to that 1941 Executive Order and they served as such under United States generals and commandants in World War II.[3]

From April, 1941, the United States had assumed the responsibility for payment of the Philippine servicemen's army pay as previously established by the Philippine Commonwealth. That scale of service pay was less than the rate of pay for regular United States enlistees or inductees. Legislation was introduced in the United States Congress to increase the Filipino service pay scale to United States Army levels but no such legislation was ever enacted.

Soon after President Roosevelt's Executive Order of 1941 questions arose concerning the status of the Filipino veterans called up under that order with respect to their entitlement to veterans' benefits. As early as May 5, 1942, the then Director of the Veterans Administration, Frank T. Hines, approved and promulgated an opinion of the Solicitor of the Veterans Administration holding that they were in "active service of the

---

2. In Cabebe v. Acheson, 183 F.2d 795 (9th Cir. 1950) our Circuit, considering the status of residents of the Philippine Islands between the cession from Spain in 1898 and the 1946 grant of independence, recognized that they were not citizens of the United States; that they were in a hybrid status described as "non-citizen nationals" of the United States, defining "nationality" as denoting the relationship between an individual and a nation involving the duty of allegiance on the part of the subject and protection on the part of the state.

3. According to the Agreed Statement, plaintiffs Librano and Marmaraldo were called into the service of the United States Armed Forces during the period 1941–1946 and suffered service-connected disabilities for which they now receive 50% of the V.A. monetary benefits otherwise payable to veterans for such service-connected disabilities.

Plaintiff Basconcillo is the surviving dependent of a Filipino whose death during the same period was service-connected and for which she now receives 50% of the monetary V.A. benefits otherwise payable to the dependents of veterans who suffered service-connected death.

Plaintiff Pascual suffered *non*-service-connected disability during the same period for which he is not entitled to certain veteran benefits.

Plaintiff Morales is the surviving dependent of a Filipino who suffered a *non*-service-connected death during the same period for which his dependents are not entitled to certain veteran benefits.

land or naval forces of the United States" within the meaning of the Veterans National Life Insurance Act of 1940. (See, Hearings Before the SubCommittee of the Senate Committee on Appropriations, 79th Congress, 2d Session, "Attachment" to Agreed Statement herein, pp. 56–57). However, the Congress eventually determined otherwise, as will hereinafter appear.

## LEGISLATIVE HISTORY

In October, 1945, after the end of World War II and while Congress was considering a 200 million dollar appropriation for the support of the Philippine Army in accordance with its practice during the War, the Chairman of the SubCommittee of the Senate Committee on Appropriations sent a letter to General Bradley, then Director of the Veterans Administration, requesting information concerning the status of the Filipino servicemen and the potential cost of their veteran benefit coverage. (See, Attachment to Agreed Statement, p. 49).

In his response (Attachment, pp. 49–54), General Bradley again expressed

the administrative view of the Veterans Administration that veterans, i.e., "those who served in the active military or naval forces of the United States," did include "persons who were a part of the organized forces of the government of the Commonwealth of the Philippines called into service of the Armed Forces of the United States pursuant to military order of the President of the United States, July 26, 1941."

In his same 1945 letter, General Bradley gave to the subcommittee his estimate that the total cost of paying veterans' benefits to members of the Philippine Commonwealth Army and their dependents, under then existing veterans' laws, would amount in the long run to about 3 billion dollars. (Attachment p. 54).

Upon receipt of this response, the Chairman of the Senate SubCommittee made an important statement bearing on the reasons of the Congress for the then pending 1946 legislation, (Attachment, pp. 55, 57–59), a statement which we set forth as a note because of its length.[4] (See Footnotes).

4. Said the Chairman of the SubCommittee: "Three billion dollars is a substantial sum of money, and if Filipinos were eligible to receive it, there would be good reason to reduce or eliminate other proposed expenditures by the United States for their benefit. But no one could be found who would assert that it was ever the clear intention of Congress that such benefits as are granted under the Servicemen's Readjustment Act of 1940, as amended—the GI Bill of Rights— should be extended to the soldiers of the Philippine Army. There is nothing in the text of any of the laws enacted by Congress for the benefit of veterans to indicate such intent. (p. 57).

"The real question in the case of the soldiers of the Philippine Army is whether they have served 'in the active military or naval service of the United States.' There is nothing to indicate that there was any discussion of the meaning of that term, probably because it is generally well recognized and has been used . in many statutes having to do with members or former members of the American armed forces. It would normally be construed to include persons regularly enlisted or inducted in the regular manner in the military and naval service of the United States. (p. 57).

"There is no suggestion that Congress had in mind covering under the GI Bill of Rights any classes not theretofore understood to be included within the meaning of the words 'in the active military or naval service of the United States,' which is the primary basis for entitlement to its benefits. It is certainly unthinkable that the Congress would extend the normal meaning of the term to cover the large number of Filipinos to whom it has been suggested that the Servicemen's Readjustment Act of 1940 applies, at a cost running into billions of dollars, aside from other considerations, without some reference of dollars, aside from other considerations, without some reference to it either in the debates in Congress or in the committee reports. (p. 58)

&ast; &ast; &ast; &ast; &ast;

"Upon the principle that the Philippine Army was serving with our Army but was not a part of the armed forces of the United States, the War Department took prompt action to disapprove the proposal to extend the American pay rates to soldiers serving in the Philippine Army and requested that the proclamation making such a promise be rescinded. Members of the Philippine Army did not actually receive the pay of an Ameri-

The Congress then enacted the 1946 legislation above set forth, appropriating 200 million dollars for the support of the Philippine Army but adding as a rider the 1946 legislation which plaintiffs now challenge.

When the appropriation, bearing this rider, came to President Truman, he approved it, stating that, although he believed the United States had a moral obligation to provide for the heroic Philippine veterans who sacrificed so much for the common cause during the war, he, nevertheless, recognized that there were certain "practical difficulties in making payments to Philippine Army veterans under the GI Bill of Rights" and that he was "preparing a plan to meet such practical difficulties and expected to request Congress to implement a plan when it is evolved." (Attachment, p. 60).

Upon receipt of President Truman's message, the Chairman of the Sub-Committee made another important statement bearing on the Congressional rationale for the 1946 legislation (Attachment p. 61)—a statement which we set forth as a note because of its length.[5] (See Footnotes)

can soldier, which has a direct bearing upon the question as to whether that army is a part of the armed forces of the United States. .(p. 58).

"It was, therefore, decided that the legal situation must be promptly clarified and that the best way to accomplish it was by way of an amendment to the surplus appropriation rescission bill, H.R. 4407, then under consideration by this committee, and which was to provide for an appropriation of $200,000,000 for the Army of the Philippines. Senator McKellar, as acting chairman, appointed me to serve on a subcommittee along with Senator Russell of Georgia, and Senator Brooks of Illinois. We are the authors of the following amendment, which finally became a law on February 18, 1946, as Public Law 301, Seventy-ninth Congress: (here is set forth the 1946 legislation here in question).

"The first effect of the amendment from the point of view of the United States Treasury was to reduce a liability for veterans' benefits from $3,000,000,000 to $500,000,000, both of these amounts being based upon estimates made by the Veterans Administration. This was accomplished by limiting such benefits to pensions on account of service-connected disability or death and by further providing that, when allowed, such pensions shall be paid at the rate of one Philippine peso for each dollar otherwise authorized.

"Provision was not made for hospital and medical care, because the committee was advised that there are 10,000 surplus hospital beds and other hospital equipment in the Philippine Islands which will be transferred to the Philippine government under the provisions of the Tydings bill, S. 1610. That bill also contains a provision which authorizes the United States Public Health Service to cooperate with the Philippine government in hospital activities."

5. "There is merit in President Truman's assertion that there is 'a moral obligation of the United States to look after the welfare of Philippine Army veterans,' but his statement recognized 'that certain practical difficulties exist in applying the GI Bill of Rights to the Philippines.' It was the view of the Congress that immediate action was required, that facts were not available upon which to base a proper solution to these 'practical difficulties.' Consequently it was decided that, except for pensions based upon service-connected disability or death, the best way to proceed was to wipe the slate clean.

"The GI Bill of Rights is intended to benefit an American who served in the armed forces and who, upon his discharge from the service, returns to civil life in the United States, where American standards of living prevail. A peso in the Philippines will go as far as a dollar in the United States. A Filipino veteran does not need 150 pesos a week as unemployment compensation. Neither is he justified in asking for a loan of 8,000 pesos to buy a farm or to go into business. Whenever any part of the GI Bill of Rights is extended to Filipino veterans, the cost of living in the Philippines and other economic factors must be given careful consideration.

"The first effect of the amendment from the point of view of the United States Treasury was to reduce a liability for veterans' benefits from $3,000,000,000 to $500,000,000, both of these amounts being based upon estimates made by the Veterans Administration. This was accomplished by limiting such benefits to pensions on account of service-connected disability or death and by further providing that, when allowed, such pensions shall be paid at the rate of one Philippine peso for each dollar otherwise authorized.

"As I see it, the best thing the American government can do is to help the Filipino people to help themselves. Where there was a choice between expenditures for the

Since the enactment of this legislation in 1946, it has been the subject of continuing attention by the federal executive department and by the Congress.[6]

## APPLICABILITY OF U. S. CONSTITUTION AND LAWS RE LEGISLATION AFFECTING RESIDENTS OF THE PHILIPPINE ISLANDS

In the pending case the question is whether Congress, having granted to the Philippine veterans and their dependents compensation for service-connected injury or death, was obliged by some constitutional provision, e. g., the Fifth Amendment, to also grant to them additional veterans' benefits merely because the latter were made available to veterans resident in the United States; also whether some such constitutional provision prohibited the Congress from limiting the allowed service-connected compensation, as to Philippine veterans, to 50% of the amount paid to other veterans.

Under an early revised statute of 1878, section 1891, thereof, the Congress had provided generally that the Consti-

tution (and all laws of the United States which are not locally inapplicable), shall have the same force and effect within all of the organized territories, and in every territory thereafter organized, as elsewhere within the United States.

The Treaty of Paris, however, under which the United States acquired the Philippines, provided (Article IX) that the civil rights and political status of the native inhabitants "shall be determined by the Congress," indicating an intent to give the Congress a free hand in dealing with the newly acquired possession. Dorr v. United States, infra, 195 U.S. p. 143, 24 S.Ct. 808.

Further, the original Organic Act of July 1, 1902, 32 Stat. 691 (setting up a system of civil government for the Philippines and providing that all then residents of the Philippine Islands and their subsequently born children should be deemed to be "citizens of the Philippine Islands" entitled to the protection of the United States) expressly further provided, as noted in Dorr v. United States, infra, p. 143 of 195 U.S., 24 S.Ct. 808, that the above Section 1891 of the Re-

rehabilitation of the economy of the Philippine Islands and payments in cash to Filipino veterans, I am sure it is better to spend any equal sum of money, for example, on improving the roads and port facilities. What the Filipino veteran needs is steady employment rather than to depend for his living upon a monthly payment sent from the United States . . . ."

6. As indicated in Congressional Record, 9/19/66, pp. 22905–22913, in 1946 President Truman did appoint an Interdepartmental Committee on Philippine Veterans. Between 1955 and 1959 the U. S. Departments of Defense and State gave exhaustive study to a list of claims presented by a Philippine Commonwealth economic mission. In 1964 a Joint Commission was appointed by the President of the United States and the President of the Philippines to consider possible Philippine veteran inequities. The Congress, itself, has considered and adopted substantial legislation on the subject, some of it in the form of amendments to the 1946 legislation, e. g., in 1947, 1956, 1961, 1966. This legislation includes various laws embodying a degree of the recommendations of the Truman 1946 Interdepartmental Com-

mittee, e. g., 1948 grants for the construction and equipment of hospitals in the Philippines and for expenses incident to hospitalization of Filipino veterans, including the 1955 completion of the Veterans' Memorial Hospital near Manila; also 1966 legislation designed to extend Veterans' benefits in the Philippines in accordance with recommendations of the U. S. panel of the Joint Commission, including the 1966 amendment updating of the peso to dollar provision of the 1946 legislation to reflect economic changes in the Philippines in a manner favorable to Philippine veterans.

It has been responsibly stated in the Congress as of 1966 that (See Congressional Record, supra, p. 22909) "In spite of past mistakes made by both the United States and the Philippines, the U. S. Government has always recognized the special relationship between the two peoples. The United States has met its responsibilities to the Philippines in a substantial manner—even though the Filipino has not achieved full equality with the American veteran . . . . Since 1946 more than one billion has been expended on veterans' benefits." (p. 22909)

vised Statutes of 1878, supra, should *not* apply to the Philippine Islands.

It has been long established that the United States may acquire territory by treaty and govern it through the exercise by Congress of its power under Art. IV, Sec. 3 to make rules and regulations respecting the territory or other property belonging to the United States.

It has also been long established that the United States Constitution does not automatically and wholly apply to newly acquired territory which merely belongs to the United States, but which has never been incorporated into the Union—even though such territory has been given an organized government—and that the Congress, when exercising its powers over such territory under Art. IV, Sec. 3, is not subject to the same constitutional limitations as when it is legislating for the United States. See, Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); Dorr v. United States, 195 U.S. 138, 149, 24 S.Ct. 808, 49 L.Ed. 128 (1903); Balzac v. Porto Rico, 258 U.S. 298, 304, 42 S.Ct. 343, 66 L.Ed. 627 (1922); Hooven v. Evatt, 325 U.S. 652, 672–678, 65 S.Ct. 870, 89 L.Ed. 1252 (1944); see also, United States v. Gancy, 54 F.Supp. 756 (D.C.Minn.1944); United States v. Farwell, 76 F.Supp. 35 (D.C.Alaska 1948); Virgin Islands v. Rijos, 285 F.Supp. 126 (V.I.1958).

It has also been long recognized by all of the above cases that dependencies of the United States, acquired as the result of our war with Spain, including the Philippines, are territories belonging to, but not incorporated as a part of the Union of States under the Constitution and that, therefore, the Philippines fall within the above stated rule. (Id.)

The rule, as hereinabove stated, does not mean that the power of the Congress over unincorporated territory is absolute and unrestrained. These cases recognize that there may be "fundamental limitations in favor of personal rights" e. g., deprivation "of life, liberty or property without due process of law" or "principles which are the basis of all free government which cannot with impunity be transcended" to which the Congress would be subject. It is conceivable, therefore, that a question may be presented under some circumstances as to whether certain constitutional limitations would be applicable to restrict the Congress. See, *Downes*, supra, 182 U.S. pp. 269, 280, 282, 292, 21 S.Ct. 770; *Dorr*, supra, 195 U.S. pp. 146, 147, 149, 24 S.Ct. 808; *Balzac*, supra, 312 of 258 U.S., 42 S.Ct. 343; see also, Hooven v. Evatt, supra, 325 U.S. p. 674, 65 S.Ct. 870.

Subject, however, to this implied humanitarian qualification, Constitutional guarantees extend to such unincorporated territories *only* as the Congress, exercising its Art. IV, Sec. 3 powers, makes them applicable and "large powers" and "the widest latitude of discretion" are entrusted to the Congress when dealing with territories which are not incorporated into the United States, e. g., the Philippines. *Downes*, supra, 182 U.S. p. 283, 21 S.Ct. 770; *Dorr*, supra, 195 U.S. p. 147, 24 S.Ct. 808; *Hooven*, supra, 325 U.S. p. 674, 65 S.Ct. 870.

Upon this legal basis it has been held, for example, in *Dorr*, supra, that the Constitutional guarantees of jury trial under Article III and under the 5th and 7th Amendments, do not apply to the Philippines; also, e. g., in *Hooven*, supra, and in *Downes*, supra, that Constitutional restrictions upon Congress in dealing with merchandise brought into the United States do not apply when dealing with merchandise brought from the Philippines. Also, e. g., in *Virgin Islands*, supra, that the 5th Amendment requirement of a Grand Jury indictment does not apply to the Philippines; also as in *Gancy*, supra, that Filipinos are aliens within the meaning of the Alien Registration Act.

Since even United States citizens and residents have no constitutional or fundamental right, as such, to receive veterans' benefits at all, such a limited

exclusion of Filipino veterans certainly does not involve fundamental personal rights or principles, affecting life, liberty or property within the meaning of the above cases.

Having in mind, then, the unique and wide discretion long recognized as in the Congress when legislating under Art. IV, Sec. 3, for distant, non-incorporated territory, such as the Philippines, we cannot go so far as to say that Congress was required by some other provision of the Constitution to also provide Filipino veterans with the additional fringe benefits available to other veterans. Nor can we say that the Congress was prohibited by any constitutional provision from limiting the allowed pensions for Filipino veterans to 50% of the amount paid other veterans.

## EQUAL PROTECTION—DUE PROCESS

It is not necessary, however, to rest the decision of this case solely upon the ground that constitutional limitations were not applicable to the Congress when exercising its broad discretion under Art. IV, Sec. 3, for making rules for unincorporated Territories.

Even if constitutional limitations upon the Congress be deemed applicable to this legislation affecting the Philippines, such a provision could be only the 5th Amendment[7] and the question would still remain whether the Congressional differentiation between the two classes of veterans violated any equal protection right of plaintiffs, i. e., whether the classification was rationally based and, even if not, whether the resulting discrimination was so unjustifiable as to amount to denial of 5th Amendment due process within the

meaning of Bolling v. Sharp, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

Plaintiffs broadly contend that there was no rational basis in fact for the differentiation; that there was no recognizable difference between the Filipino servicemen, on the one hand, and other enlisted or inducted servicemen; that both became "part" of the active armed forces of the United States and were the same in kind and of equal military value and that, therefore, the legislation was a denial of equal protection of the law and (inferentially) sufficiently unjustifiable to amount to a denial of due process.

The government, on the other hand, contends that members of the organized military of the Philippines were called "into the service of the armed forces of the United States" but that they did not thereby become "part" of the active military or naval forces of the United States in the same manner as other enlisted or inducted servicemen; that the differentiation between the two kinds of servicemen for purposes of allowance of veterans' benefits was based, not upon ground of race or alienage, or merely to cut expenses, but, in part, upon this difference in their military status within our armed forces; also in part upon "practical difficulties" involved in making certain kinds of veterans' benefits available in the Philippines; also in part upon a difference in monetary and living standards between the United States and the Philippines.

Whatever may have been the technical status distinction between the Filipino servicemen component, on the one hand, and the other regularly inducted or enlisted servicemen component of our arm-

---

7. Plaintiffs contend that they are deprived of "equal protection" of law. The Constitution, however, does not contain any "equal protection" restriction upon federal legislation; the 5th Amendment mentions only "due process of law;" the 14th Amendment, which does mention "equal protection," is a restriction only upon the States. Therefore, in the pending case, the real issue is not "equal protection," but whether the federal legislation here challenged is a Congressional violation of 5th Amendment "due process" within the meaning of Bolling v. Sharp, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) wherein the court, recognizing that "equal protection" and "due process" are not always interchangeable phrases, merely holds that "discrimination may be so unjustifiable as to be violative of due process."

ed forces in the Philippines, the record shows that there were "practical difficulties" recognized by both the Executive and the Congress which would be involved in any attempt to make available in the Philippines to Filipino veterans the additional GI benefits here in question, e. g., administration and facilities in the Philippines for handling such benefits as GI education, vocational, civil service, etc.

As to the 50% monetary limitation of allowed service-connected benefits for Filipino veterans, the Congressionally asserted reason for this differentiation was that standards of living and monetary purchasing power in the Philippines were wholly different from those in the United States—so much so that, if compensation for service-connected death or injury were paid to veterans in the Philippines in the same monetary currency as paid to veterans living in the United States, the Philippine veterans might be receiving more (in buying power) than the former.

Upon this record we hold that the differentiation made by the Congress had a rational basis and, therefore, did not amount to a denial of Fourteenth Amendment equal protection or of Fifth Amendment due process. See, Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (March 4, 1974); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).[8]

Further, a reading of the Supreme Court cases above cited discloses that one of the main grounds for conceding wide discretion to the Congress when legislating under Art. IV, Sec. 3, for distant, unincorporated territories is the recognition that conditions in such Territories so widely differ from those in the United States that constitutional provisions should not wholly and automatically bind the Congress.

For the foregoing reasons we reach the conclusion that the legislation here in question is not unconstitutional.

This same conclusion has been recently reached in the District of Columbia Circuit in the recent case of Lagtapon v. Secretary of Health, Education and Welfare, 156 U.S.App.D.C. 363, 481 F.2d 538 (1973) where the court, considering whether 38 U.S.C. § 107 and its 1946 predecessor legislation (the identical legislation here challenged) effectively excluded these 1941 Filipino veterans from a veterans' benefit provision (42 U.S.C. § 417(a)(1) of the Social Security Act) designed to give to World War II veterans certain presumptive wage earnings during their military service in order to qualify them for eventual Social Security benefits—including so-called Parents' Insurance Benefits created in 1950 by 42 U.S.C. § 402(h)(1).

The court held that 38 U.S.C. § 107 (and its predecessor 1946 legislation) did have such an exclusionary effect

---

8. In Johnson v. Robison, 415 U.S. 361, 94 S. Ct. 1160, 39 L.Ed.2d 389 (1974), the Supreme Court, reversing the District Court, 352 F.Supp. 848 (D.C.Mass.1973), held, again citing Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225, that a limitation of veterans' educational benefits (under 38 U.S.C. § 1651 et seq.), to military service veterans (as distinguished from conscientious objectors who performed required alternative work) was not an arbitrary classification as against such conscientious objectors; that the quantitative and qualitative distinctions between the disruption caused by military service and that caused by alternative civilian service (military service involving a six-year commitment and greater loss of personal freedom and alternative service

involving only a two year obligation and no obligation to leave civilian life) formed a rational basis for the Congressional classification limiting educational benefits to military service veterans as a means of helping them to readjust to civilian life.

Similarly, in Richardson v. Belcher, 404 U. S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) the Supreme Court, considering the constitutionality of Section 224 of the Social Security Act (42 U.S.C. § 424a) (which provided that Social Security disability payments shall be reduced to reflect payments under any compensation law of the United States or a state) held the classification was rationally related to the achievement of the letitimate goal of elimininating duplication of benefits.

and, further, rejected a contention that the legislation was unconstitutional.[9]

▆ We have given careful consideration to the fact that, although all plaintiffs herein were Philippine residents during the period of their (or their spouses') service for the Philippine Commonwealth, three of the plaintiffs have since become residents of the United States and three of them have since become citizens of the United States.

At argument plaintiffs expressed their willingness to limit their attack on constitutionality to this class of Filipino veterans, i.e., those who have since become citizens of or alien residents of the United States, thus impliedly conceding that the challenged legislation might be valid and enforceable as to other Filipino veterans or at least leaving any such question to future litigation.

In this way plaintiffs seek to bring themselves within the rule of Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), to the effect that Fourteenth Amendment due process applies even to aliens lawfully admitted into and resident within the United States.

The obvious difficulty with this argument is that plaintiffs were neither citizens nor residents of the United States, but were in a legal sense non-resident foreigners in 1946 when the Congress specifically and unqualifiedly provided that service of members of the Philippine Commonwealth armed forces, while in the service of the armed forces of the United States, shall *not* be deemed active military service for the purpose of any veteran benefit law of the United States —with the service-connected exception already noted.

Plaintiffs' eligibility for veterans' benefits stems solely from and depends upon the kind of military service thus described by the Congress as not being a basis for other veteran benefits.

If the challenged statute was constitutionally valid at the time of its passage in 1946 as to the class described (which we here hold) it could not suddenly become unconstitutional as to plaintiffs or others by the mere fact of their subsequent voluntary decision to travel and take residence in the United States. To so hold would amount to a rewriting of the statute and to legal bootstrapping that might prove to be an embarrassing judicial precedent.

Although it would be much more pleasant to rule in favor of plaintiffs, we are compelled by the law as above set forth to conclude that, if there is any change to be made in the law, that is a matter for the Congress, not for this Court. Plaintiffs' motion for summary judgment on the issue of constitutionality is, therefore, denied.

KILKENNY, Circuit Judge (dissenting):

The majority opinion treats in a rather cavalier manner the factor in the case which I deem controlling. I here emphasize that all of the named plaintiffs, though formerly Philippine residents, are now either resident citizens of the United States or resident aliens within the United States. It is against these two classes that the discriminatory provisions of the challenged legislation tend to operate. The only classes claimed to be represented by plaintiffs are those of Filipino servicemen, or their spouses, who have now become either resident American citizens or Filipino aliens resi-

---

9. The court said: "We find no merit in this argument. Congress clearly had a rational basis for excluding Philippine servicemen from the 1950 Amendments, since, as mentioned above, the purpose of restoring Social Security benefits did not apply to such servicemen" (i. e., to Philippine servicemen who had not ever been covered by Social Security). "Additionally," the court added, "the

Philippines became an independent country in 1946, and Congress cannot be faulted for not extending coverage of the Social Security Act to citizens of another country. Nor can it be argued that this exclusion violated appellant's due process rights. See Richardson v. Belcher, 404 U.S. 78 [92 S.Ct. 254, 30 L. Ed.2d 231] (1971)."

dent in the United States. Here, we are not concerned with the rights and privileges, if any, of the Filipino veterans still living in the Philippines. We need only reach a conclusion on whether the named classes, if otherwise within the purview of the veterans' benefit legislation, are entitled to full benefits despite the provisions of 38 U.S.C. § 107.

The overall result of the challenged legislation is to deprive Filipino veterans and their beneficiaries of all war benefits to which non-Filipino veterans or their beneficiaries are entitled, except benefits for service-connected disability or death (and benefits under certain pre-1946 National Life Insurance Contracts), and, further, to limit the allowed benefits to 50% of the monetary amount to which non-Filipino veterans are entitled.

The reason asserted by the Congress for the monetary limitation placed on benefits to Filipino veterans was that a peso in the Philippines would go as far as a dollar in the United States and that whenever any part of the GI Bill of Rights was extended to Filipino veterans, the cost of living in the Philippines and other economic factors should be given careful consideration.[1] The basis for this monetary limitation—rational and valid as it might be with respect to Filipino veterans still living in the Philippines—would have no rational application to Filipino veterans living in the United States, such as plaintiffs. Standards of living and monetary purchasing power in the Philippines are determined by factors wholly different from factors affecting such matters within the States. Obviously, if benefits were paid to veterans living in the Philippines in the same monetary currency as paid to veterans living in the United States, those Filipino veterans would be unjustly enriched.

Another distinction, vaguely asserted by the Congress, is that a difference existed in military status between the Filipino servicemen and other servicemen in that the former were ". . . in the service of . . .", but not ". . . part of the Armed Services" of the United States. In my opinion, this is not a rationally-based distinction. It is here agreed that as the Bataan Campaign wore on whatever distinction there may have been between those serving in the Philippine Commonwealth Army and those serving in the service of the Armed Forces of the United States gradually disappeared. If there ever was a distinction, it was one without a difference as the battered armies of both the Commonwealth and the States crawled through the last bitter and blood-stained miles on their way to eventual surrender at Corregidor.

The distinctions Congress attempted to draw in placing limitations on the benefits to the Filipino veterans were an obvious effort on the part of the government to reduce the overall cost of veterans' benefits by refusing any longer to recognize that Filipino servicemen were in fact—for all practical purposes—part of the active Armed Services of the United States within the meaning of the United States Veterans' Benefits statutes.

These facts were clearly recognized by President Truman in his letter to the

---

1. * * * * *
"The GI bill of rights is intended to benefit an American who served in the armed forces and who, upon his discharge from the service, returns to civil life in the United States, where American standards of living prevail. A peso in the Philippines will go as far as a dollar in the United States. A Filipino veteran does not need 150 pesos a month in order that he may go to school or 40 pesos a week as unemployment compensation. Neither is he justified in asking for a loan of 8,000 pesos to buy a farm or to go into business. Whenever any part of the GI bill of rights is extended to Filipino veterans, the cost of living in the Philippines and other economic factors must be given careful consideration."
* * * * *
[Senator Hayden of Arizona, Hearings before the Subcommittee of the Committee on Appropriations, United States Senate, 79th Congress, 2d Session on H.R. 5604, March 25, 1946, at 60.]

Subcommittee of February 20, 1946, when he said:

"Philippine Army veterans are nationals of the United States and will continue in that status until July 4, 1946. They fought, as American nationals, under the American flag, and under the direction of our military leaders. They fought with gallantry and courage under most difficult conditions during the recent conflict. Their officers were commissioned by us. Their official organization, the Army of the Philippine Commonwealth, *was taken into the armed forces of the United States* by Executive order of the President of the United States on July 26, 1941. That order has never been revoked or amended." [Statement by the President, Hearings before the Subcommittee of the Committee on Appropriations, *supra,* at 60; emphasis supplied.]

That the Congress was concerned with the rights of Filipinos who actually became citizens of the United States was made manifest by Senator Hayden's statement on the effect of the nationality provisions in the amendment to the recision bill, from which I quote:

"The amendment as enacted cancels any right which soldiers in the Philippine Army may have had to become citizens of the United States under the Nationality Act of 1940, as amended by title X of the Second War Powers Act of 1942. It was the view of the committee that the approximately 200,000 Filipinos who first and last served in that army did so because they fervently desired freedom

for their country and not with the idea of acquiring the right to go to another country.

That army consisted of 200,000 of the best citizens of the Philippines, who, to a large extent, hold the future of the islands in their hands. It would be the worst kind of public policy practically to invite them to leave their homes, where their position as patriots is recognized, and come to the United States, where, as immigrants, they would have to begin at the very bottom of the economic ladder to make their way upward. In the end it would be doing no favor to hold out such an inducement to leave the land they love and for which they fought so valiantly." [*Id.* at 60.]

Ironically, one of the classes before us is composed of citizens of the United States who, in war time, were Philippine Army Veterans but also Nationals of the United States.[2]

To me it is crystal clear that the Congress never intended to discriminate against Philippine Army Nationals living in the United States and subject to the same living standards as their American brothers with whom they fought and died. In light of the Congressional intent to distinguish between those who were subject to the lower living standards in the Philippines from those with the higher living standards in the United States, it is illogical to argue that the Filipino serviceman's entitlement to benefits is based upon the prior service, rather than upon the present fact of residency or citizenship. True enough, the affected classes before

---

2. "STATEMENT BY THE PRESIDENT"

\*　　\*　　\*　　\*　　\*

"However, the passage and approval of this legislation do not release the United States from its moral obligation to provide for the heroic Philippine veterans who sacrificed so much for the common cause during the war."

\*　　\*　　\*　　\*　　\*

"I consider it a moral obligation of the United States to look after the welfare of Philippine Army veterans.

I recognize, of course, that the Commonwealth government and after it, the Government of the Philippine Republic, have obligations to these veterans. But the government of the Philippines is in no position today, nor will it be for a number of years, to support a large-scale program of the care of its veterans."

\*　　\*　　\*　　\*　　\*

*Id.*

us exercised their right voluntarily to travel to the States. Likewise, one class voluntarily became citizens of the United States. On the other hand, we held out the doormat of welcome, and the one class became citizens and the other lawfully entered as aliens. I have always thought there are no second class citizens in the United States, and I do not believe a lawfully entered alien should be the subject of discrimination unless the Congressional intent is clear. The rights of these plaintiffs grew out of precisely the same bloody conflict as did the entitlements of their American counterparts.

Although two hundred million dollars were appropriated in 1946 for support of the Philippine Army, there is nothing in the legislative history to indicate that these funds, or any other funds, were to be used by the Philippine Commonwealth to pay benefits to Filipino veterans in lieu of payment of benefits by the United States. The record shows that no part of the two hundred million dollars has ever been used by the Philippine Commonwealth for such benefits.

The fundamental principles by which the constitutionality of this type of legislation must be tested are well established. Once having established a policy granting veterans' benefits, the Congress may not discriminate between classes of veterans unless there is a rational basis for the classification. Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Also, discrimination is impermissible when the classification is according to race, nationality or alienage, unless the classification is necessary to protect some compelling governmental interest. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

While the issue before us, involving as it does a federal statute, is not directly covered by the Fourteenth Amendment's equal protection clause, the classifications which are here under attack must be consistent with the due process requirements of the Fifth Amendment. Richardson v. Belcher, *supra*, 404 U.S. at 81, 92 S.Ct. 254; Bolling v. Sharpe, 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

As applied to the classes of veterans before us, I have grave doubt as to the constitutionality of the challenged legislation. However, I would avoid the constitutional challenge altogether by invoking judicial restraint. It is my opinion that the Congress never intended this legislation to apply to a Filipino veteran who became a citizen of the United States or a Filipino veteran legally residing in the United States. The Congressional history is solidly behind this view.

Lagtapon v. Secretary of HEW, 156 U.S.App.D.C. 363, 481 F.2d 538 (1973), upon which defendants rely so heavily, involved a construction of 42 U.S.C. § 402(h) in an action to collect Parents' Insurance Benefits, rather than the interpretation of 38 U.S.C. § 107, the statute before us. Although not necessary to the decision, the court in *Lagtapon* proceeded to consider § 107 and held that it was not unconstitutional. *Lagtapon* is a slender reed upon which to rest a decision under the facts here present. Another distinguishing feature of great significance is the fact that there the decedent was neither a citizen nor a resident of the United States. Such, of course, is not the case here.

I would grant the relief prayed for in plaintiffs' complaint.