**Cornelio R. BESINGA, Plaintiff–Appellant,**

v.

**UNITED STATES of America; U.S. Attorney General, Defendants–Appellees.**

**No. 92–56075.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1993.

Decided Jan. 19, 1994.

Cornelio R. Besinga, pro se, Rosemead, CA, for plaintiff-appellant.

Michael C. Johnson, Asst. U.S. Atty., Los Angeles, CA, for defendants-appellees.

Before: BROWNING, BEEZER and TROTT, Circuit Judges.

BEEZER, Circuit Judge:

Appellant pro se, Cornelio R. Besinga, a World War II veteran of the Philippine Commonwealth Army, challenges the district court's grant of summary judgment to the United States. He contends that the court erroneously rejected his constitutional challenge to the First Supplemental Surplus Appropriation Rescission Act of 1946.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

I

The resolution of Besinga's constitutional challenge to the classification implicit in the

---

1. Pub.L. No. 79–301, 60 Stat. 14 (1946), codified as amended at 38 U.S.C. § 107(a) (1988).

First Supplemental Surplus Appropriation Rescission Act requires some familiarity with the history of joint U.S.–Filipino involvement in the Second World War. On July 26, 1941, with the increasing likelihood of war with Imperial Japan, President Roosevelt invoked his powers under § 2(a)(12) of the Philippine Independence Act [2] to "call and order into the service of the Armed Forces of the United States ... all of the organized military forces of the Government of the Commonwealth of the Philippines." 6 Fed.Reg. 3825 (1941). Besinga, like thousands of his comrades,[3] was thus temporarily brought into the service of the United States military.

At this time, the Philippines was a territory of the United States. Pursuant to the 1934 Independence Act, however, the Philippines Commonwealth had a "unique" status, possessing broad powers over its internal affairs. *Filipino American Veterans and Dependents Ass'n v. United States*, 391 F.Supp. 1314, 1317 (N.D.Cal.1974) (three judge district court panel) ("*Filipino American Veterans*"). By 1935, the Filipinos had adopted a Constitution, organized a new government and established the Philippine Commonwealth Army ("Commonwealth Army").[4]

After the issuance of the 1941 Executive Order, it was contemplated that the Commonwealth Army would retain its national integrity, "with its own uniforms, its own scales of pay, its own promotion list, its own rations, and its own code of military law, with Philippine Army headquarters theoretically being responsible for discipline and punishment." Office of the Center for Military History, The Status of Members of Philippine Military Forces During World War II, at 25 (June 1973) (unpublished manuscript prepared for the government's use in *Filipino American Veterans*) ("OCMH Study"); *see also Logronio v. United States*, 133 F.Supp. 395, 401, 132 Ct.Cl. 596 (1955). However, events quickly altered this understanding. After the outbreak of war, Congress authorized $269 million to mobilize, train, equip and pay the Philippine Army and gave General MacArthur authority to allocate expenditures. OCMH Study, at 11–12. On the battlefield, distinctions between U.S. and Commonwealth Army forces tended to disappear as the military campaign wore on. *Id.* at 12.

The history of the ensuing military engagement is well-known. The joint American–Filipino stand at Corregidor stands as a testament to courage and endurance. The privations experienced by American and Filipino servicemen has added "Bataan" to the lexicon of human horror.

Despite the contrary feelings of General MacArthur and a sympathetic United States Senate,[5] Commonwealth Army members were not paid wages equal to those of American military personnel. *Id.* at 34–35. The Philippine government did, without American opposition, raise Commonwealth Army pay scales to conform to those paid to another Filipino military grouping, the Old Philippine Scouts.[6] After American reentry into the

---

**2.** Pub.L. No. 73–127, § 10(a), 48 Stat. 456, 463 (1934).

**3.** It is estimated that as of December 18, 1941, the strength of the Commonwealth Army stood at approximately 120,000 officers and enlisted men. Office of the Center for Military History, The Status of Members of Philippine Military Forces During World War II, at 13 (June 1973) (unpublished manuscript prepared for the government's use in *Filipino American Veterans and Dependents Ass'n v. United States*, 391 F.Supp. 1314 (N.D.Cal.1974) (three judge district court panel)).

**4.** Philippine Commonwealth Act No. 1, 21 December 1935.

**5.** General MacArthur recommended equalization of Commonwealth Army pay scales to the United States Army rate on February 22 and March 9, 1942. OCMH Study, at 18. Relevant legislation was subsequently introduced in Congress. S. 2387, "An Act to Equalize the Pay of all Personnel in the United States Army, the Navy, and the Philippine Scouts, and the Philippine Commonwealth Army," passed the Senate on March 30, 1942. *Id.* at 19. With the surrender of the Philippines, the issue became moot. The Act never passed the House of Representatives. *Id.*

**6.** Organized in 1899, the Old Philippine Scouts were incorporated into the regular United States Army in 1901. *See* Act of February 2, 1901 § 36, 31 Stat. 748, 757–58. The Old Philippine Scouts have always been considered a United States Army unit and have always received full United States veterans benefits. OCMH Study, at 42. At the outbreak of World War II, the Old Philippine Scouts had approximately 12,000 members. *Id.*

Philippines in October 1944, the Philippine government again attempted to raise pay scales to United States Army levels. However, this attempt was rebuffed by the War Department, which opposed the plan due to the additional drain on the U.S. Treasury and to the perceived inflationary consequences on the Philippine economy. *Id.* at 37–41.

It was in this context that Congress passed the First Supplemental Surplus Appropriation Rescission Act on February 18, 1946, shortly after the conclusion of the war but before the Philippines became an independent state.[7] A rider attached to this legislation conditioned an appropriation of $200 million for the benefit of the postwar Philippine Army on the basis that Commonwealth Army members who were called into service under the President's 1941 order "shall not be deemed to be or have been military or naval forces of the United States"[8] for purposes of determining eligibility under most veterans benefit programs. A subsequent Appropriation Rescission Act[9] placed similar conditions on the so-called New Philippine Scouts, organized pursuant to the Armed Forces Voluntary Recruitment Act of 1945.[10] The practical consequence of this legislation was to render Commonwealth Army and New Philippine Scouts personnel ineligible for all United States veterans benefits, except for certain service-connected disability and death benefits.[11]

Sometime after his service, Besinga became a naturalized United States citizen. He filed this action in 1987. In *Besinga v.*

*United States*, 879 F.2d 626 (9th Cir.1989), we upheld the dismissal of the action on grounds of res judicata, citing *Filipino American Veterans*. We subsequently withdrew our opinion and in *Besinga v. United States*, 923 F.2d 133 (9th Cir.1991), concluded that Besinga was not bound by the judgment in *Filipino American Veterans* because he failed to receive proper notice. On remand, the district court granted summary judgment to the United States on the strength of the reasoning in *Quiban v. Veterans Administration*, 928 F.2d 1154 (D.C.Cir.1991). On appeal, Besinga seeks reversal of the district court's conclusion that the First Supplemental Surplus Appropriation Rescission Act does not violate the Due Process Clause.

## II

■ We review de novo grants of summary judgment. *FDIC v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992). Because the facts are not in dispute, we review on purely legal grounds the judgment granted by the district court. *Multnomah County Medical Society v. Scott*, 825 F.2d 1410, 1413 (9th Cir.1987).

## III

Besinga's central contention is that the rider attached to the First Supplemental Surplus Appropriation Rescission Act conflicts with the equal protection component of the Due Process Clause. He argues that the *Quiban* court, and *a fortiori* the district court, erred in concluding that the First Supplemental Surplus Appropriation Rescission

---

7. The Philippines became an independent state on July 4 of that year.

8. As currently codified at 38 U.S.C. § 107, the First Supplemental Surplus Appropriation Rescission Act provides in pertinent part that:
[s]ervice before July 1, 1946, in the organized military forces of the government of the Commonwealth of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President dated July 26, 1941, ... shall not be deemed to have been active military, naval or air service for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the Armed Forces....

9. Pub.L. No. 79–391, 60 Stat. 221, 223 (1946), codified as amended at 38 U.S.C. § 107(b) (1988).

10. Pub.L. No. 79–190, § 14, 59 Stat. 538, 543 (1945). These forces were originally organized with a view towards the imminent invasion of Japan but were phased out by 1950. OCMH Study, at 46–47.

11. Eligibility for benefits generally depends on "veteran" status. 38 U.S.C. § 101(2) defines "veterans" as those who served "in the active military, naval, or air service." To stipulate that certain service is not "active military ... service" is to deny benefits for that service.

Act does not require heightened scrutiny because the rider erects an invidiously discriminatory classification on the alternative bases of race, nationality or alienage.

■ Ordinarily, "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). "[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). If the classification is, however, made on the basis of race, nationality or alienage, the statute will be sustained only if it is suitably tailored to serve a compelling state interest. *Id.*

■ Confronted by an identical argument, the District of Columbia Circuit rejected the plaintiffs' invitation to apply heightened scrutiny on the controlling authority of two Supreme Court per curiam opinions. *Quiban,* 928 F.2d at 1159–60. Because we agree that *Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (per curiam), and *Califano v. Torres,* 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam), are controlling on the question of the appropriate standard of review, we too reject Besinga's invitation to apply strict scrutiny.

In *Harris v. Rosario,* the Supreme Court rejected an equal protection challenge to a statutory limitation on Aid to Families with Dependent Children payments to residents of Puerto Rico. The Court concluded that Congress "may treat [Territories] differently from States so long as there is a rational basis." 446 U.S. at 651–52, 100 S.Ct. at 1930. The conclusion in *Rosario* was based on *Califano v. Torres.* In *Torres,* the Supreme Court upheld the constitutionality of an amendment to the Social Security Act barring payments to residents of Puerto Rico. Torres received benefits while residing in Connecticut but was denied benefits when he moved to Puerto Rico. 435 U.S. at 2–3, 98 S.Ct. at 907–08. The district court concluded

that the amendment was unconstitutional because it abridged Torres' fundamental right to travel. *Id.* at 4, 98 S.Ct. at 908. The Supreme Court reversed, concluding, incidentally to its rule of decision, that in rejecting the plaintiffs' equal protection theory, the district court properly acknowledged that Congress has the power to treat territories differently. *Id.* at 3 n. 4, 98 S.Ct. at 907 n. 4.

■ We agree with the District of Columbia Circuit that this authority compels the conclusion that the broad powers of Congress under the Territory Clause [12] are inconsistent with the application of heightened judicial scrutiny to economic legislation pertaining to the territories. A contrary rule would subject virtually every failure by Congress to extend federal benefits to residents of the territories to the charge that the decision was " 'based on impermissible considerations of race or national origin.' " *Quiban v. Veterans Admin.,* 928 F.2d 1154, 1160 (D.C.Cir. 1991) (quoting *Quiban v. United States Veterans Admin.,* 713 F.Supp. 436, 443 (D.D.C. 1989)). Because the Philippines was a territory of the United States at the relevant time, this dispute implicates Congress' power to regulate territorial affairs under the Territory Clause. Controlling precedent dictates rational basis review.

## IV

Besinga contends that the classification implicit in the First Supplemental Surplus Appropriation Rescission Act lacks a rational basis. Highlighting the fact that any ostensible distinctions between Commonwealth Army and United States forces tended to disappear as the military campaign in the Philippines wore on, he argues that Congress' denial of veteran status to Commonwealth Army personnel was arbitrary. He also points out that the treatment accorded Commonwealth Army members differs not only from that of United States personnel but also from that accorded to other territorial forces, including the Old Philippine Scouts. This, in his view, only compounds the legislation's utter irrationality.

---

**12.** U.S. Const. art. IV, § 3, cl. 2 authorizes Congress to "make all needful Rules and Regulations respecting the Territory ... belonging to the United States."

## A

■ Besinga argues forcefully and eloquently that the rider attached to the First Supplemental Surplus Appropriation Rescission Act worked a grave injustice towards him and his fellow Commonwealth Army veterans who "swore allegiance" to and faithfully served the United States. He asks us to correct what he perceives to be an act of deep ingratitude by declaring unconstitutional the rider that denied him the status of a United States veteran.

Presumptively rational economic legislation will not be invalidated absent a "clear showing of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). In assessing whether a statute rationally furthers a legitimate goal, we "consider the actual basis on which the legislature acted or any hypothetical basis on which it might have acted." *Roley v. Pierce Cty. Fire Protection Dist. No. 4*, 869 F.2d 491, 493 (9th Cir.1989).

We note at the outset that the offensive rider was attached to an appropriation of $200 million for the benefit of the Philippine Army. The question Besinga raises then is not whether Congress could have rationally denied that he was brought into the service of the United States military pursuant to the President's 1941 Order; rather, the question before us is whether Congress could have rationally chosen to award a different package of benefits[13] to Commonwealth Army servicemen than that awarded United States Army or other territorial military groupings, such as the Old Philippine Scouts.

The District of Columbia Circuit concluded that *Rosario* and *Torres* controlled not only the standard of review but also the merits of the constitutional challenge. *Quiban*, 928

F.2d at 1161. *Torres* and *Rosario* considered three factors in determining that the denial of SSI benefits to Puerto Rican residents satisfied the rational basis inquiry: (1) Puerto Rican residents do not contribute to the federal treasury, and thus do not help defray the costs of the program; (2) the costs of including Puerto Rican residents "would be extremely great—an estimated $300 million per year"; and (3) inclusion of Puerto Ricans "might seriously disrupt the Puerto Rican economy." *Torres*, 435 U.S. at 5 n. 7, 98 S.Ct. at 908; *Rosario*, 446 U.S. at 652, 100 S.Ct. at 1930.

These factors are present here. We conclude that they are dispositive; however, in concluding that the classification implicit in the First Supplemental Surplus Appropriation Rescission Act has a rational basis, we also rely on factors cited by the government in its brief and relied on by the court in *Filipino American Veterans*, 391 F.Supp. at 1321–22. These latter factors are related to the Philippines' unique status during the interregnum between the passage of the Independence Act and Philippine independence day. We find particularly compelling the factor that Congress may have considered the practical administrative difficulties inherent in dispensing benefits directly to citizens of what was soon to become a foreign state. Congress may also have considered the differences in military status between Commonwealth Army and United States personnel. Even if formal distinctions between Commonwealth Army and United States forces virtually disappeared as the military campaign in the Philippines wore on, it remains true that the Commonwealth Army was formed by an act of the Philippine legislature. It was contemplated that the Commonwealth Army would retain its national integrity even after it was brought within the

---

**13.** We refer to a "different" package of benefits because, properly understood, the question raised by this appeal is whether Congress could have rationally determined that members of the Commonwealth Army should be provided benefits through a series of, admittedly smaller, lump sum payments remitted directly to the Philippine government on their behalf. In addition to the initial $200 million appropriation in the First Supplemental Surplus Appropriation Rescission Act and the continued eligibility of Filipino veterans for service-related death and disability bene-

fits, the United States government remitted $480 million to the Philippine government for war-related reconstruction expenses. These payments also benefitted Commonwealth Army veterans, albeit indirectly. Brief of Appellee, at 12–13.

In this respect, it is also notable that Commonwealth Army veterans are eligible to receive benefits under the Philippine G.I. bill of rights. *Id.*; see Republic Act No. 65 (Oct. 18, 1946), codified, as amended, at 78 Phil.Code. §§ 1–15.

United States Armed Forces. We cannot say that Congress acted arbitrarily in honoring this distinction.

■ Under the rational basis standard of review, it is not our place to second-guess Congress' motivations. Whether Congress attached the rider to the First Supplemental Surplus Appropriation Rescission Act based on its estimate that the payment of benefits would be prohibitively expensive [14] or whether Congress acted out of the more enlightened concern that the direct payment of benefits to hundreds of thousands of Filipino men and women might be perceived as a threat to the sovereignty of the soon-to-be-independent Republic of the Philippines is of no moment. A single rational factor will sustain the statute.

### B

■ The factors discussed above also dispose of Besinga's contention that the First Supplemental Surplus Appropriation Rescission Act drew an irrational distinction between the Commonwealth Army and the Old Philippine Scouts. It is axiomatic in rational basis inquiry that "a common characteristic shared by beneficiaries and nonbeneficiaries alike, is not sufficient to invalidate a statute when other characteristics peculiar to only one group rationally explain the statute's different treatment of the two groups." *Johnson v. Robison,* 415 U.S. 361, 378, 94 S.Ct. 1160, 1171, 39 L.Ed.2d 389 (1974). Moreover, "[i]n the area of ... social welfare ... [a] classification does not offend the Constitution simply because ... '[it] is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

The Commonwealth Army and Old Philippine Scouts arguably shared more characteristics than did Commonwealth Army and United States forces; however, their distinct origins, histories and relative sizes suggest rational bases for the different treatment of these groupings. The Old Philippine Scouts were organized pursuant to an Act of Congress. These forces were incorporated into the United States Army as early as 1901. Old Philippine Scouts were from their inception under the command of United States officers and were paid directly by the War Department. Given this history, it is conceivable that Congress viewed the Old Philippine Scouts as more integrally a part of the United States armed forces. *Quiban,* 928 F.2d at 1162–63; *cf. New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (upholding grandfather provision challenged as violative of equal protection).

As a practical matter, Congress' exclusion of the Old Philippine Scouts from the First Supplemental Surplus Appropriation Rescission Act rider provided benefits to roughly 12,000 veterans. An additional 120,000 veterans would have been similarly eligible if benefits had been extended to Commonwealth Army forces. The disparity in the size of these respective classes implicates the second and third *Torres* factors. In essence, the extension of benefits to the Old Philippine Scouts not only imposed a relatively small drain on the Treasury but also was unlikely to lead to any appreciable inflationary pressure on the Philippine economy. For this reason, Congress also may have determined that providing direct payments to Old Philippine Scouts veterans would prove more feasible from an administrative standpoint.

### V

Besinga contends that his status as a United States resident and citizen distinguishes him from the plaintiffs whose claims for benefits were denied in *Quiban.* He argues that this distinction invalidates the district court's reliance on *Quiban* and requires reversal of the grant of summary judgment.

As a preliminary matter, Besinga is correct that *Quiban* is silent on whether the

---

14. "The costs of extending full veterans' benefits to veterans of the [Philippine Commonwealth Army] would approach $2 billion annually, for a substantial period of time." *Quiban,* 928 F.2d at 1161.

reasoning in *Rosario* and *Torres* extends to Commonwealth Army veterans who subsequently become United States residents. On its face, the three-factor *Torres* test relied on by the District of Columbia Circuit does not squarely apply in this context. Specifically, as a United States resident, Besinga pays taxes and, thus, helps defray the costs of veterans programs. This invalidates the first *Torres* factor. Also, because he is a United States resident, any benefits paid to Besinga would have no appreciable effect on the Philippine economy. This invalidates the third *Torres* factor. In essence, it can be argued that both *Rosario* and *Torres*, as well as *Quiban*, concerned only what may be deemed an "outbound" issue concerning Congress' power to treat residents of the territories differently than residents of the states. Besinga's case, on the other hand, concerns an "inbound" issue of whether the denial of benefits could be sustained against claims made by a Commonwealth Army veteran who subsequently becomes a United States resident.

 Besinga's status as a United States resident and citizen does not, however, alter our conclusion. Nothing in *Torres* or *Rosario* suggests that a challenged statute must satisfy all, or a majority, of the three *Torres* factors. Even if these opinions were amenable to such a reading, our determination that the classification implicit in the First Supplemental Surplus Appropriation Rescission Act has a rational basis does not rest exclusively on these factors. We also found conclusive administrative difficulties and distinctions between the Commonwealth Army and other relevant military groupings arising out of the Philippines' unique status.

Although Besinga correctly points out that *Quiban* does not reach these facts, he fails to demonstrate why his subsequent acquisition of United States residency requires a contrary legal conclusion. The classification drawn by Congress was based on service in the army of a particular *territory* at a partic-

ular *time*. We have already determined that Congress did not lack a rational basis for this legislation. Besinga's subsequent acquisition of United States residency does not bring him outside the reach of the statute. Neither does the continuing denial of benefits or veteran status for the sole purpose of determining eligibility for certain veterans benefits presently deprive Besinga of any rights protected by the Federal Constitution.

We can illustrate this point by analogizing to the facts in *Torres*. It is noncontroversial that if Torres had lawfully moved from Puerto Rico to the United States, he would have been eligible to receive federal benefits once he met applicable requirements. Even if Torres moved to the United States, however, he could not successfully maintain that equal protection or due process required that his eligibility to receive federal benefits be based on criteria that Congress, acting within its sphere of power, expressly prohibited. In other words, once lawfully admitted into the United States, Torres would still be required to meet the applicable statutory requirements. Only if deemed statutorily eligible could Torres claim that a denial of those benefits was violative of equal protection or due process.

In passing the First Supplemental Surplus Appropriation Rescission Act rider, Congress determined that service in the Commonwealth Army does not render a person eligible for certain veterans benefits. This determination was not utterly lacking in rationality. Thus, even though lawfully admitted to the United States, Besinga fails to meet the statutory requirements for eligibility. As in the *Torres* counterfactual, his due-process claim must consequently fail.

## VI

Besinga's remaining arguments are wholly without merit.[15]

---

15. Besinga contends that the district court erred in relying on *Quiban* because that court concluded that 38 U.S.C. § 107 was constitutional, whereas he does not question the constitutionality of § 107 but only of the rider attached to the First Supplemental Surplus Appropriation Rescission Act.

As Besinga correctly points out in his brief, the First Supplemental Surplus Appropriation Rescission Act was slightly modified when codified. However, this distinction has no legal relevance. 38 U.S.C. § 107 is substantially identical to the rider attached to the First Supplemental Surplus Appropriation Rescission Act. A conclusion that

## VII

The district court's grant of summary judgment is

AFFIRMED.

§ 107 is constitutional is, *a fortiori,* a conclusion that the attached rider is constitutional.