UNITED STATES of America,
Plaintiff–Appellee,

v.

313.34 ACRES OF LAND, MORE OR LESS, SITUATED IN JEFFERSON COUNTY, STATE OF WASHINGTON, etc., et al., Defendant,

Jeffrey Jay Kamp; Jill Jay Kamp,
Defendants–Appellants.

No. 89–35529.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1990.

Decided Jan. 15, 1991.

Duncan C. Wilson, Sampson Wilson & Combs, Renton, Wash., for defendants-appellants.

George W. Van Cleve and Angus E. Crane, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before HALL, THOMPSON and LEAVY, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Following final judgment in the government's condemnation action, Jeffrey and Jill Kamp (the "Kamps") appeal the district court's denial of their motion for life use of their property pursuant to the Protection Island National Wildlife Refuge Act of 1982, Pub.L. No. 97–333, §§ 2–8, 96 Stat. 1623 (the "Act"). The district court held none of the structures on the Kamps' property on Protection Island is "suitable for use as a personal residence" within the meaning of the Act. The court based this determination on the fact that no building permit was issued for any of the structures, a circumstance which the Fish and Wildlife Service (the "Service") asserted was necessary to a residence being "suitable" under the Act. The district court concluded that the Act did not require the Fish and Wildlife Service to offer the Kamps a life use, or a shorter extended period of use, of their property. We affirm.

## FACTS

Protection Island is a 400–acre island located at the entrance of Puget Sound in Jefferson County, Washington. The Island "provides nesting habitat for 72 per centum of the entire seabird population of Puget Sound and the Strait of Juan de Fuca" and "also provides refuge for other species, including the endangered bald eagle and the harbor seal." *Id.* § 2(1) and (2). Congress described Protection Island as "a nationally significant environmental resource threatened with destruction through residential and related development." *Id.* § 2(3).

In order to preserve the Island's natural habitat, Congress passed the Protection Island National Wildlife Refuge Act of 1982. The Act authorized the Secretary of the Interior "to acquire lands and waters or interests therein within the boundaries of the refuge" by purchase, donation, exchange or condemnation. *Id.* § 4(a) and (e). Congress recognized, however, that its attempt to protect the wildlife on Protection Island could impact the Island's human population as well. In consideration of this, the Act directed the Secretary to offer to owners of land that contains "a structure, suitable for use as a personal resi-

dence, that was located on the land on January 1, 1982," a life use or, at the option of the landowner, a shorter extended use of the property. *Id.* § 4(b)(1)(A). In a separate provision, the Act also permitted the Secretary to give "special consideration to providing for extended use reservations" on lots which contain no such structures "to the extent compatible with the purposes for which the refuge is established." *Id.* § 4(c).

In 1976, the Kamps inherited from their grandfather three adjacent lots, Lots 3092, 3093 and 3094, on Protection Island. There are three trailers on Lot 3092. There is one trailer on Lot 3093. All trailers located on the lots are equipped with functional bathroom and kitchen facilities, and heating and lighting systems. The trailer on Lot 3093 contains a tub and shower, and is permanently fixed to the land by a septic tank connection and by a wooden deck with posts set in concrete. In addition to the trailers on Lot 3092, there is a three-room wood cabin with a wood stove and propane fueled lights and stove.

The Act gave to the Service the authority to define the phrase "structures, suitable for use as a personal residence." The Service defined the phrase as including only those structures which are "habitable." Relying on the Act's legislative history and after consultations with the local planning department, the Service determined that a structure can be deemed "habitable" only if constructed pursuant to approved building permits. Because no permit is on file for any of the Kamps' structures, the Service did not offer the Kamps a life estate or an extended use reservation for any of their lots.

On April 11, 1986, the United States filed a complaint in condemnation to acquire 313.34 acres on Protection Island. The government simultaneously filed a declaration of taking for numerous lots on the Island, including Lots 3092, 3093, and 3094. The sum of $1,538,102 was deposited as the estimated just compensation for the taking.

The Kamps filed a motion for life use in the district court, asserting that two of the trailers on Lots 3092 and 3093 and the wood cabin on Lot 3092 were "structures, suitable for use as a personal residence" within the meaning of the Act. In denying the motion, the court found that the government had "proven by a preponderance of the evidence that defendants Kamp are not entitled to life use of structures located on Lots 3092, 3093, and 3094 because the structures are not 'suitable for use as a personal residence' in that, no building permits were issued for any of the structures." This appeal followed.[1]

## DISCUSSION

Section 4(b)(1) of the Act provides:

In the case of any person who is the owner of land as of January 1, 1982, that—

(A) is within the boundaries of the refuge and contains a structure, suitable for use as a personal residence, that was located on the land on January 1, 1982; and

(B) in the judgment of the Secretary the United States should acquire a fee simple interest therein;

the Secretary shall first offer to acquire the land subject to a life use, or, at the option of the owner, to an extended use reservation for a shorter term of years, subject to such terms and conditions as the Secretary deems necessary or appropriate to insure that the land will be used in a manner that is compatible with the purposes for which the refuge is established.

The Kamps contend that the Service's interpretation of the phrase "structures, suitable for use as a personal residence" conflicts with the plain meaning of section 4(b)(1)(A) of the Act. Relying on dictionary definitions of the words of the statute, the Kamps argue that "suitable for use as a personal residence" means nothing more than "fit and appropriate for use as a home." They therefore conclude that, be-

---

1. The parties stipulated to just compensation of $19,926 for the three lots, but reserved the Kamps' right to appeal the denial of life use. A final judgment was entered on June 22, 1989. Enforcement of that judgment has been stayed pending this appeal.

cause the structures on their land contain "functional bathrooms, kitchens, heating and lighting systems as well as sleeping facilities," Appellant's Brief at 22, the Act requires the Secretary to offer them a life use of their property.

Congress nowhere defined the crucial phrase "structure, suitable for use as a personal residence." Had it done so, of course, our task would be complete. *See Chevron USA v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (unambiguously expressed intent of Congress controls statutory interpretation). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9.

■■■ Where "Congress has not directly addressed the precise question at issue," however, we do not simply impose our own construction on the statute. *Id.* at 843, 104 S.Ct. at 2781. Instead, we turn to the interpretation of the administrative agency charged with administering the statute in question.[2]

While we recognize that "the judiciary is the final arbiter of issues of statutory construction, an administrative agency's interpretation of a statute it is charged with administering is accorded substantial deference." *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1342 (9th Cir.1990). We thus stress the limited nature of our review of the Service's interpretation of the statutory language. "[W]e should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer*, 367

U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

■■■ The interpretation given a statute by an agency need not represent the only permissible reading of the statutory language, or the "best" reading, or the reading the court might have given the statute had the issue been considered initially in a judicial proceeding. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Instead, the agency's interpretation of the statutory language needs only be "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. To prevail, then, the Kamps must demonstrate that the Service's interpretation finds no reasonable support in the text of the Act or its legislative history.

In judging the Service's interpretation of the statute, we first examine the statutory text itself. "In construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed accurately expresses the legislative purpose." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985) (quotation and footnote omitted). If the words of the statute are unambiguous, our inquiry is at an end, and the plain meaning of the text must be enforced. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

■■■ We cannot say there is a plain meaning of the phrase "structure, suitable for use as a personal residence" which leaves no room for doubt as to the intent of Congress. The word "suitable" itself can take on many meanings depending upon the end in view and the individual doing the

---

2. We reject at the outset the Kamps' argument that the Service did not have the authority to interpret the statutory life use language. Section 6 of the Act provides that "[p]rior to the establishment of the refuge and thereafter, the Secretary [of the Interior] shall administer the lands, waters, and interests therein acquired for the refuge in accordance with the National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. § 668 dd-ee)." Pub.L. No. 97–333, 96 Stat. 1623, 1624. Title 16, § 668

dd(a)(1) of the United States Code provides that all "wildlife refuges ... shall be administered by the Secretary through the United States Fish and Wildlife Service." Thus, the Act supplies the Service with the authority necessary to interpret and apply the life estate provision. The Service's construction of the life estate provision constitutes an interpretive rule and is not subject to the APA's rulemaking requirements. *See Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983).

viewing. "Suitable" as applied to a property owner or occupant might include considerations such as whether a structure has inside plumbing, a sound roof, room to move about, light and air, and sufficient integrity to assure reasonable protection against the elements. A local governmental entity responsible for land use in the area might be more interested in additional factors such as those typically taken into consideration in issuing building permits. To the federal agency responsible for implementing the Act, other concerns might legitimately assume importance. For example, the Service might consider "suitable for use as a personal residence" only those structures that have little adverse environmental impact. In short, the statutory text gives little basis for choosing among various alternatives, and the word "suitable" is ambiguous.

Viewed against the purpose of the statute, the ambiguous term "suitable" takes on the flavor of something that is consistent with a structure remaining on the Island and being occupied without disrupting or impairing the preservation of the natural habitat. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983) (in construing an ambiguous phrase in a statute a court should "'take in connection with it the whole statute ... and the objects and policy of the law'") (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1857)). A structure "suitable for use as a personal residence" in this context may, for example, be a structure which has appropriate sanitation facilities, materials which will not have an adverse impact on the environment as the structure is used and occupied over the years, appropriate connection to the ground and a method for handling water runoff so as not to concentrate the flow of surface waters in a manner which will erode or otherwise damage the environment. The Service's interpretation of the term "suitable" with reference to the requirement of a building permit plausibly furthers these ends. The Kamps have not shown that this "accommodation is not one that Congress would have sanc-

tioned." *Shimer*, 367 U.S. at 383, 81 S.Ct. at 1560.

The Service's interpretation also finds some support in the legislative history. *United States v. State of Washington*, 872 F.2d 874, 879 (9th Cir.1989) (where text is ambiguous, resort may properly be had to legislative history). Indeed, at one point the Senate Report explicitly states that, "a structure is a personal residence when it has been constructed in accordance with residential building permits issued by the appropriate county authority or is part of the county assessor's determination of the property's assessed value as an 'improved' property. The mere fact that persons sleep in the structure on some nights each year is insufficient to render a structure a 'personal residence.'" Senate Report No. 426, 97th Cong., 2d Sess. 4 (1982).

We recognize that other parts of the legislative history contradict the Service's interpretation. It is not our task, however, to glean from the legislative history the "best" or "most convincing" interpretation. The Service has construed the statute to mean that for a structure to be "suitable for use as a personal residence" it must have been built pursuant to local building permits. This interpretation is plausible given the statutory text, the legislative history, and the purpose of the statute. In sum, we cannot say that the Service's interpretation is "unreasonable" even though we might believe another interpretation is just as reasonable, or perhaps more reasonable. *See Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. at 39, 102 S.Ct. at 46.

■ The Kamps also argue that even if the Service's interpretation of the statute is upheld, the district court erred in finding that the necessary building permit for the trailer on Lot 3093 had not been issued.

At trial, the Kamps presented evidence suggesting that it was the Jefferson County auditor's routine practice to require an individual applying for a septic tank permit to first receive a building permit. Because a septic tank permit had been obtained for the trailer on Lot 3093, the Kamps argue it should be presumed that the building per-

mit for this structure was also issued, even though they cannot provide a copy of a building permit.

"Absent evidence to the contrary, the applicable presumption is that the ordinary course of business was followed and that the law was obeyed; also that official duty was regularly and faithfully performed." *United States v. State of Washington*, 233 F.2d 811, 816 (9th Cir.1956). Even assuming, however, that the Kamps are entitled to the benefit of this presumption, the district court did not err in finding that the building permit was never issued. The presumption the Kamps describe is not an irrebuttable one. Instead, it simply shifts to the Service the burden of going forward with evidence demonstrating that no permit was obtained. The Service presented at trial sufficient evidence to show that the "routine" in question here was easily circumvented and often ignored. Notwithstanding the presumption, the district court's finding that no building permit was issued for any of the structures on the Kamps' lots is not clearly erroneous.

The judgment of the district court is AFFIRMED.

LEAVY, Circuit Judge, dissenting:

Because I disagree with the majority's conclusions both that the phrase "structures, suitable for use as a personal residence" is ambiguous and that the Secretary's interpretation thereof as requiring a building permit was reasonable, I respectfully dissent.

The starting point in every case involving construction of a statute is the statutory language itself. Unless otherwise defined, the words selected by Congress should be given their ordinary, common meaning. *Foxgord v. Hischemoeller*, 820 F.2d 1030, 1032 (9th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 502 (1987). "In construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed accurately expresses the legislative purpose."

1. A Washington appellate court has included "[a] trailer placed on land for use as a dwelling" within the definition of "structure." *See*

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985) (quotation & footnote omitted). Where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

The dictionary is the place to determine the ordinary and plain meaning of the statutory terms "structure, suitable for use as a personal residence." *See Foxgord*, 820 F.2d at 1032. "Structure" is commonly defined as "[t]hat which is built or constructed; an edifice or building of any kind." [1] *Black's Law Dictionary* 1276 (5th ed. 1979). "Suitable" is defined as "[f]it and appropriate for the end in view." *Id.* at 1286. "Residence" is defined generally as a place of dwelling or habitation. *See, e.g., Webster's New World Dictionary* 1209 (2d ed. 1984). By combining the definition of the above terms, the statutory phrase "structure, suitable for use as a personal residence" plainly means any building which is fit to dwell in. This plain meaning does not suggest or imply a permit requirement.

The plain meaning of legislation is conclusive "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *Ron Pair Enters.*, 109 S.Ct. at 1031 (quotation omitted). *See Commodity Futures Trading Comm'n v. P.I.E., Inc.*, 853 F.2d 721, 725 (9th Cir.1988) (plain meaning conclusive unless "a literal reading of the statute would thwart the underlying purposes of the statutory scheme or lead to an absurd result"). That is not the case here.

Congress expressly ordered the Secretary to offer to acquire certain land subject to extended and life use reservations "in order to lessen the impact of Federal [acquisition] on the present owners." Protec-

*Anderson v. State, Dep't of Ecology*, 34 Wash. App. 744, 664 P.2d 1278, 1281 (1983) (quotation omitted).

tion Island National Wildlife Refuge Act, Pub.L. No. 97–333, § 4(b)(1), 96 Stat. 1623 (1982) (the "Act"). Congress clearly felt that "subject to such terms and conditions as the Secretary deems necessary," *id.*, such use would be compatible with the purposes for which the refuge was established. There is no indication from the express terms of the Act that granting life uses to persons who own structures which are fit for habitation, but for which no building permits were issued, contravenes the intent of Congress in drafting the Act. A structure need not be constructed pursuant to an approved building permit to be fit to dwell in. Congress could easily have included a permit requirement in the Act itself if that had been its true intent in permitting life uses. It did not do so.

This conclusion is amply supported by the legislative history. *See Escobar Ruiz v. INS,* 838 F.2d 1020, 1023 (9th Cir.1988) (en banc) (court may look to the legislative history to see if the plain and unambiguous statutory language is contrary to the clearly expressed legislative intention). The "life use" provision was added to the Act by its author, the House of Representatives, "to insure that those owners who have homes on the Island be allowed to use them for the remainder of their lives." H.R. No. 403, 97th Cong., 1st Sess. 6 (1981). The House believed that such level of use would be "compatible with preserving the bird life on the Island." *Id.* The Senate thereafter approved the life-use provision without any amendments.

The legislative history also supports the plain meaning of the statutory language and the conclusion that it was not Congress' intent to include a permit requirement. The House Committee Report provides:

> The Committee [on Merchant Marine and Fisheries] has intentionally used the term "located," rather than "constructed" because it *intends that trailers which are suitable for use as a personal residence should be included in this provision.* The Committee does not in-

tend that this provision apply to pop-up campers or other small trailers that serve as mobile camps but rather to those trailers which contain the essential components of a residence, such as a kitchen and bath facilities, and which could be considered as taxable real property by the Jefferson County, Washington, taxing authority.

> The Committee notes there are a number of derelict houses and trailers on the island that are not habitable now but might have been at one time. These structures should not be regarded as habitable residences for the purposes of this provision.

*Id.* (emphasis added). There is no evidence to suggest that a structure "located" on property, such as a trailer, must be "constructed" pursuant to an approved building permit.

As the majority opinion notes, there is some legislative history developed in the Senate which suggests that a permit requirement was contemplated. *See* Senate Report No. 426, 97th Cong., 2d Sess. 3–4 (1982). However, where, as here, "possible conflicting inferences" can be drawn, "the language of the statute generally prevails over the legislative history." *In re Stringer,* 847 F.2d 549, 551 (9th Cir.1988). *See Eagle–Picher Indus., Inc. v. United States EPA,* 759 F.2d 922, 929 (D.C.Cir.1985) (statutory language controls where it conflicts with one portion of the legislative history). The statutory language does not suggest or imply a permit requirement in order for the life-use provision to apply. Moreover, it is "plainly wrong ... to regard committee reports as drafted more meticulously and as reflecting the congressional will more accurately than the statutory text itself. Committee reports ... do not embody the law. Congress ... votes on the statutory words, not on different expressions packaged in committee reports." *Abourezk v. Reagan,* 785 F.2d 1043, 1054 n. 11 (D.C.1986), *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).[2] Therefore, the clear statutory language controls.

---

**2.** The Senate Report's permit requirement also contradicts other portions of the Act. Congress

knew prior to passing the Act that Jefferson County had imposed a building moratorium on

The restrictive interpretation adopted by the Service and the majority opinion is inconsistent with the express statutory mandate. Congress broadly ordered the Secretary to offer to acquire the land subject to a life use where the land contained a structure fit to dwell in. If Congress as a whole had meant to exclude trailers or limit life uses only to structures built in accordance with a building permit, it could easily have done so by inserting language to that effect in the Act itself. It chose not to. Accordingly, I would remand the case for a determination whether, despite the lack of building permits, the Kamp structures are "suitable for use as personal residence[s]" within the meaning of the Act.

Protection Island in 1974. No new residential building permits were issued after 1974. Nevertheless, Congress selected January 1, 1982, as the date for determining eligibility for life uses—the landowner was entitled to a life use if the "structure ... was located on the land on January 1, 1982." Thus, to imply a permit requirement would require the date for determining eligibility to be rolled back to 1974. Such an interpretation contradicts and usurps the clear statutory language of section 4(b)(1)(A).