Pepito Mabalot ALMERO; Quirico David; Eustaquio Santa Cruz; Nemesio Evangelista Marasigan, Petitioners–Appellees,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent–Appellant.

No. 92–56425.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1993.

Decided March 9, 1994.

Marshall Tamor Golding, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent-appellant.

Philip D. Abramowitz, Korenberg, Abramowitz & Feldun, Encino, California, for the petitioners-appellees.

Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.

PREGERSON, Circuit Judge:

## I. INTRODUCTION

This case requires us to interpret § 405 of the Immigration Act of 1990, Public Law 101–649 ("IMMACT"), enacted by Congress to extend eligibility for United States citizenship to Filipino veterans of World War II. Cong.Rec. S17111 (1977) (statement of Sen. Simon). The Immigration and Naturalization Service ("INS") contends that under § 405 of IMMACT the Filipino veterans must prove their military service by a certificate from the United States Army. The veterans argue, and the district court agreed, that such a certificate is not the sole means under § 405 to prove qualifying military service. We affirm.

## II. BACKGROUND

During World War II, Congress relaxed the statutory naturalization requirements for non-citizens who fought against the Axis powers. Nationality Act of 1940, 54 Stat. 1137, as amended by Act of March 27, 1942, 56 Stat. 182 ("1942 Act"). Among the promised beneficiaries of the 1942 Act were Filipino soldiers who had been called into U.S. military service the year before by President Roosevelt. Military Order of July 26, 1941; Cong.Rec. H28554 (1989) (Statement of Rep. Morrison in support of precursor to IMMACT § 405).

Section 702 of the 1942 Act provided a five-year window during which veterans could be naturalized outside of the United States. But from the date of the Act's passage until June 1945, the Japanese occupation prevented veterans fighting in the Philippines from taking advantage of the relaxed statutory naturalization requirements. 4 Charles Gordon & Stanley Mailman, *Immigration Law and Procedure* § 97.05[1] (1993). After the Japanese defeat, the Attorney General yielded to Philippine fears of a manpower drain by temporarily withdrawing the authority of the American Consulate in the Philippines to process naturalization applications. *See Pangilinan v. I.N.S.* 796 F.2d 1091, 1093–1094 (9th Cir.1986) (reviewing the factual and legal history of the Philippine naturalization statutes), *rev'd*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988); *See also Besinga v. United States,* 14 F.3d 1356, 1357–58 (9th Cir.1994) (discussing the history of the joint U.S.–Filipino World War II effort). Consular officials accepted naturalization applications in the Philippines during only seven of the eighteen months of eligibility following the islands' liberation. *Id.* As a result, the majority of Filipino veterans legally entitled to naturalization under the 1942 Act were, as a practical matter, precluded from applying. *See Olegario v. United States,* 629 F.2d 204, 210 (2d Cir.1980) (quoting internal INS memorandum), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

The Supreme Court's decision in *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), brought a definitive end to nearly a half-century of efforts to rectify this wrong through litigation. In *Pangilinan,* the Court held that Filipino veterans had no statutory right to naturalization once the 1942 Act expired on December 31, 1946, and that the courts could not create such a right. *Id.* at 882–85, 108 S.Ct. at 2215–17. During its next session, Congress passed § 405 of IMMACT,

to extend to these heroic Filipino veterans the right to apply for United States Citi-

zenship 40 years after the time when we intended to have that go into effect ... keeping a promise that this country made to these individuals when we very much needed and wanted their assistance to fight the Japanese in the Philippines during the Second World War.

Cong.Rec. H28554 (1989) (remarks of Rep. Morrison). Section 405 applied to Filipino veterans who served in the armed forces between September 1, 1939 and December 31, 1946.

In the present case, the District Court found that the Filipino Petitioners–Appellees all served honorably in the allied effort against the Japanese during World War II and otherwise satisfied the statutory requirements for naturalization.[1] The INS does not challenge this finding on appeal. *See* Appellant's Reply Brief, at 3 n. 1. Nevertheless, the INS rejected Appellees' petitions because Appellees were unable to prove their qualifying service by referring solely to records and lists kept by the United States Army in the National Personnel Records Center, or in the Army Reserve Personnel Center, in St. Louis, Missouri.

The parties differ markedly on the accuracy and comprehensiveness of the lists of those who served in the Philippines kept by the U.S. Army in St. Louis. The district court did not make any explicit findings regarding the accuracy or comprehensiveness of those lists.[2] It is undisputed that no records exist in St. Louis of Filipino veterans who left the Philippine forces during the first 21 months covered by § 405 of IMMACT.[3] These veterans would have been discharged before the Philippine troops were called into the active service of the U.S. Army by President Roosevelt on July 26, 1941. The INS contends in its reply brief that only a handful of veterans fall into this category.

At trial, Appellees presented the testimony of Lieutenant Colonel Edwin P. Ramsey, who commanded over 40,000 guerrilla troops in the northern Philippines during World War II. Colonel Ramsey, a West Point graduate, testified that records listing the names of his troops were created under wartime conditions in which his men were greatly outnumbered by the occupying Japanese forces. Colonel Ramsey stated that his command stopped keeping accurate rosters or lists when some of the rosters fell into enemy hands, and many of those named were executed. Colonel Ramsey testified that he participated in the reconstruction of the lists after the war, but that nearly half of the Filipinos who served under his command, including some who served on his staff, were shortly thereafter "derecognized" by the Army for political reasons and their records eliminated. Other records were lost in a 1973 fire at the St. Louis Center.

The INS presents evidence for the first time in its reply brief that the "derecognition" claimed by Colonel Ramsey was "in reality" no more than a program to *reconstruct* the poorly compiled rosters and to determine which units and individuals met the standards for guerrilla recognition. The INS also contends that the records lost in the fire have been adequately reconstructed from other sources.

■ We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. We review de novo the interpretation of the Immigration and Nationality Act. *Braun v. INS*, 992 F.2d 1016, 1018 (9th Cir.1993).

### III. ANALYSIS

Section 405 of IMMACT relaxes naturalization requirements for Filipinos "who served honorably—(i) in an active-duty status under the command of the United States Armed Forces in the Far East, or (ii) *within the Philippine Army, the Philippine Scouts, or recognized guerrilla units* " at any time between September 1, 1939 and December 31, 1946. P.L. 101–649 § 405(a)(1)(B) (em-

---

**1.** Two other petitioners were found not to have met their evidentiary burden.

**2.** Considerable evidence was presented that the records were incomplete, inaccurate, and so poorly organized that files could not be located for many listed persons. However, findings in this regard were not essential to the district court's holding.

**3.** Section 405 applies to veterans who served in the Philippine forces between September 1, 1939 and December 31, 1946. IMMACT § 405(a)(1)(B).

phasis added). The benefits provided under § 405 are limited to persons who are "otherwise eligible for naturalization under section 329" of the Immigration and Nationality Act ("INA"). *Id.* § 405(a)(1)(C). For the purposes of applying § 329 of the INA to § 405 of IMMACT, "service [in the Philippine Army, the Philippine Scouts, or recognized guerrilla units] ... is considered to be honorable service in an active-duty status in the military, air, or naval forces of the United States."

Section 329 of the INA, enacted in 1952 and last amended in 1968, provides that,

> [a]ny person who, while an alien or a noncitizen national of the United States, has served honorably in an active-duty status in the military, air, or naval forces of the United States ... may be naturalized as provided in this section.... The *executive department under which such person served* shall determine whether persons have served honorably in an active-duty status....

INA § 329(a), 8 U.S.C. § 1440(a) (emphasis added). Furthermore,

> service in the military, air, or naval forces of the United States shall be *proved by a duly authenticated certification from the executive department under which the petitioner served* or is serving, which shall state whether the petitioner served honorably in an active-duty status during ... a period beginning September 1, 1939, and ending December 31, 1946....

INA § 329(b)(4), 8 U.S.C. § 1440(b)(4) (emphasis added). The predominant issue in this case is how this longstanding section of the INA interacts with the new IMMACT enacted by Congress in 1990 to affect the rights of Filipino veterans not listed with the Army in St. Louis.

 In interpreting statutes, we begin with the language of the statute itself. *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Where the plain meaning of a provision is unambiguous that meaning is controlling, except in the " 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.' " *Id.* at 242, 109 S.Ct.

at 1030 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). To determine the plain meaning and purpose of a portion of a statute, we must examine not only the specific provisions at issue, but also the structure of the law as a whole including its object and policy. *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir.1993). Where necessary, we also may make use of legislative history to illuminate the intent and meaning of a provision. *See Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441, 1453 (9th Cir.1992) (legislative history "critical to the outcome"). Finally, where the statute is silent or ambiguous regarding an issue, we grant a degree of deference to the interpretation of the administrative agency charged with implementing the statute or provision in question. *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The INS and Respondents disagree about how each of these well-established principles of statutory interpretation should be applied to IMMACT § 405 and INA § 329.

## IV. PLAIN MEANING

 Both sides agree that § 405 plainly extends eligibility for naturalization to four groups of Filipino war veterans: those who served in an active duty status at any time from September 1, 1939 to December 31, 1946 (1) under the command of the U.S. Armed Forces in the Far East; (2) in the Philippine Army; (3) in the Philippine Scouts; or (4) in a recognized guerrilla unit. IMMACT § 405(a)(1)(B). Disagreement begins with the interpretation of the meaning of subparagraph (C) which limits eligibility to those "otherwise eligible for naturalization under section 329," and with the meaning of § 329's requirement of certification by "the executive department under which petitioner served."

The INS contends that the latter phrase plainly requires certification by a *United States* government department. But nothing in the language of either the INA or the IMMACT expressly limits the certification of a veteran's eligibility to documentation by a

United States department. In fact, such a limitation would be inconsistent with Congress' evident recognition that soldiers in the Philippine Army, Philippine Scouts, or recognized guerrilla units did not *necessarily* serve in the U.S. Armed Forces: the benefits of § 405 accrue to those who served under the command of the U.S. Armed Forces "or" in one of the three Philippine units. Use of "or," rather than "including," "such as," or "and," indicates that Congress intended to include within the ambit of the statute any Filipino who served in one of the listed Philippine units, even if those units were not under the command of the U.S. Armed Forces.[4] Consequently, those individuals who served in one of the three Philippine units would not necessarily have served in *any United States* department.[5] Therefore, the statutory requirement of documentation by the executive department "under which the petitioner served" cannot properly be read to limit *Philippine* veterans to naturalization eligibility documents produced by the *United States* Army.

To overcome this argument, the INS points out that in 1952, when § 329 was enacted, there was no eligible category of veterans who had served in departments outside of the United States. Thus, according to the INS, Congress could have had in mind only certification by an executive department of the United States. While this may be true, it is not the relevant inquiry. A broadly-worded statutory provision, drafted to meet a particular problem current at a specific moment in time, may at a later date be applied in a context completely unforeseen when the statute was drafted. The relevant

inquiry for us, therefore, is what use Congress intended to make of § 329 in 1990, when it passed IMMACT.

Section 405 explicitly expanded the classes of persons eligible for naturalization beyond those who had been members of the United States Armed Forces. Congress looked to the procedures of § 329 as the mechanism for certifying the eligibility of members of the expanded classes. The words of § 329 were broad enough to accommodate this new application. "Executive department under which such persons served" has a plain meaning, which on its face is not confined to executive departments of the United States. In 1952, the only relevant application of these words may well have been to United States departments, but in 1990, under changed circumstances, the words just as clearly apply to the executive departments of the Philippine government.

Section 405(a)(2) explains that "in applying section 329" of the INA, service within the Philippine Army, Philippine Scouts, or recognized guerrilla units "is considered to be honorable service in an active-duty status in the military, air, or naval forces of the United States." IMMACT § 405(a)(2). Substituting "service within the Philippine Army, Philippine Scouts, or recognized guerrilla units" for "honorable service in an active-duty status in the military, air, or naval forces of the United States" in INA § 329, we find that service within these organizations "shall be proved by a duly authenticated certification from the executive department under which the petitioner served." INA § 329(b)(4), 8 U.S.C. § 1440(b)(4). Be-

---

4. We generally presume that Congress "says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). This initial presumption is strengthened by the legislative history of IMMACT. As initially introduced by Representative Morrison, the precursor to § 405 provided naturalization benefits to Filipinos who "served honorably in an active duty status in the military ... forces of the United States, *including* the Philippine Army, the Philippine Scouts, and recognized guerrilla units." Cong.Rec. H28554 (emphasis added) (text of H.R. 525). Congress eventually amended this language, changing "including" to "or."

5. The argument that service in one of the three Filipino armed services does not necessarily constitute service in the United States Army is bolstered by 38 U.S.C. 107(a), which provides that:

Service before July 1, 1946, in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President dated July 26, 1941 ... *shall not be deemed to have been active military ... service for the purposes of any law of the United States conferring rights, privileges, or benefits* upon any person by reason of the service of such person in the Armed Forces....

cause many of these veterans served under *Philippine* command, this language requires us to accept duly authenticated *Philippine* documents, including Philippine government records.

## V. PURPOSE, POLICY, AND LEGISLATIVE HISTORY

There can be no doubt that IMMACT § 405 is an ameliorative statute, intended to provide statutory naturalization benefits that had been denied to Philippine veterans by courts and administrative decisions for nearly half a century. In *Pangilinan,* the Supreme Court held that only Congress, not the courts, could provide the relief sought by the Philippine veteran petitioners. 486 U.S. at 883–85, 108 S.Ct. at 2216–17. During its next session, Congress reacted by passing IMMACT § 405, which provided the same benefits that were denied to the Philippine veterans by *Pangilinan.*[6] Not a single member of Congress spoke in opposition to the provision, and all of those who spoke in favor expressed their sense that it redressed a wrong, rectified an injustice, or repaid a debt owed to the Philippine soldiers who risked their lives on behalf of freedom. *See* Cong. Rec. H28554–H28556 (1989) (debate over H.R. 525); *see also* Cong.Rec. S1711 (1990) (remarks of Senator Simon).

■ In interpreting ameliorative statutes, we are guided by the familiar canon that "remedial legislation should be construed broadly to effectuate its purpose." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Nevertheless, the INS urges us to adopt the most restrictive interpretation possible, that Congress intended to limit the benefits of IMMACT § 405 solely to those able to prove their service by the documents kept by the U.S. Army in St. Louis. The INS imputes to Congress a fear that INS administrative adjudicators and federal courts would be too liberal in their determination of adequate proof of qualifying service. This is more likely the INS's own fear than that of Congress. The INS cites no authority to support its reading of congressional intent other

than the language of the statute itself. And, as discussed above, the language of the statute supports the opposite conclusion, that Congress did *not* intend to limit eligibility only to those individuals whose names are found on lists in U.S. Army centers in St. Louis.

Moreover, the INS's interpretation of the statute flies in the face of the sentiments expressed by the lawmakers who introduced and passed § 405. For example, Representative Bennett, who fought side by side with the guerrillas in the Philippines, expressed "a great deal of gratitude for the fact that I am alive today because of them." Cong.Rec. H2855 (1989). The INS would have us believe that Congress intended to deny the benefits of naturalization to Philippine veterans who *actually* fought with U.S. soldiers, solely because records of their service are not to be found among the U.S. Army records in St. Louis.

Appellees make the additional argument that factfinders should not be limited to the lists in St. Louis because those lists are allegedly incomplete. Appellees presented evidence at trial that many of those who served in the Philippine Scouts, Philippine Army, or recognized guerrilla units are missing from the lists kept in St. Louis. On appeal, the INS challenges Appellees' assertion that the lists are incomplete.

We need not resolve this dispute. Our only concern is whether Congress, under § 405, intended to limit eligibility for naturalization to veterans found on the U.S. Army lists in St. Louis. If Congress intended to impose such a specific limitation, we would be powerless to expand statutory eligibility beyond those bounds, even if the St. Louis lists were wholly inadequate. *See Pangilinan,* 486 U.S. at 885, 108 S.Ct. at 2217.

But as discussed above, Congress did *not* intend to limit eligibility solely to those Philippine servicemen found on the U.S. Army lists in St. Louis. Therefore, it is irrelevant how many persons who should be included are missing from the lists. If a *particular* petitioner is not found on the U.S. Army

---

**6.** The author of the provision in the House of Representatives mentioned *Pangilinan* by name

in his remarks introducing the precursor to § 405 to Congress.

lists, the factfinder must evaluate any authentic *Philippine* documents proffered by that petitioner, to determine whether he nevertheless served in active duty in one of the prescribed units during the time set forth by IMMACT § 405.

That is precisely what occurred in this case. The district court found that Appellees served honorably during World War II in the appropriate Philippine units but were missing from the lists kept by the U.S. Army in St. Louis. We are required to accept this finding on appeal unless it is clearly erroneous. The INS concedes that the finding is *not* clearly erroneous, but would still deny their applications. Thus, the INS's sole contention is that qualifying service must be proved by records on file in the Army centers in St. Louis.

## VI. DEFERENCE TO THE INS INTERPRETATION

During the pendency of this appeal, the INS promulgated permanent regulations implementing IMMACT § 405. 58 Fed.Reg. 45,418 (1993) (to be codified at 8 CFR 329). These regulations for the first time explicitly codify the INS policy at issue in this case. *Id.* at 45,420–421.

■ We defer to an administrative agency's interpretation regarding an issue about which the statute is silent or ambiguous. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. "But deference is not abdication, and it requires us to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *E.E.O.C. v. Arabian American Oil,* 499 U.S. 244, 258, 111 S.Ct. 1227, 1236, 113 L.Ed.2d 274 (1991) (Justice Scalia, concurring in part). *Chevron* and its progeny require us to undertake a two step procedure to determine the degree of deference due to the administrative agency's determination. *See Louisiana–Pacific Corp. v. ASARCO Inc.,* 6 F.3d 1332 (9th Cir.1993) (describing the two-step procedure). First we must "try to determine congressional intent, using tra-

ditional tools of statutory construction ... [I]f the first step fail[s], the agency's interpretation should be accepted if reasonable." *Id.* (quotation marks and citations omitted). In this case, we need not reach the second step of the *Chevron* analysis, because the traditional tools of statutory construction lead to a clear result.[7] Deference to the INS on this issue would cause us to interpret IMMACT § 405 in a manner at odds with Congress' expressed intent.

## VII. CONCLUSION

■ Just as courts may not expand statutory eligibility for naturalization beyond the bounds set by Congress, *Pangilinan,* 486 U.S. at 884, 108 S.Ct. at 2216, the INS may not *restrict* eligibility to a smaller group of beneficiaries than provided for by Congress. The INS therefore may not restrict the benefits of § 405 to those individuals with records in the St. Louis Centers, because Congress has directed that citizenship be granted to Filipinos who are otherwise eligible and can prove their service with documents from the executive department under which they served, including Philippine government records. We AFFIRM.

RYMER, Circuit Judge, dissenting:

It's hard to figure why the INS didn't leave well enough alone in this case. However, it didn't, and we must decide not how we would like Almero's appeal to come out, but how the statutes in place require it to. Applying the standard of review we are obliged to apply, *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), I have to conclude that it is not unreasonable for the INS to require that service in the military forces of the United States (which includes someone who was in the Philippine Army, the Philippine Scouts, or a recognized guerrilla unit), be proved by a "duly authenticated certification from the executive department under which" he served, and that the relevant "executive department" is an executive department of the United States government as defined in the United States Code. 5

---

**7.** For the same reason we need not determine whether, as alleged by Appellees, the INS vacil-

lated in its previous interpretations of § 405.

U.S.C. § 101 (1988). I therefore dissent from the majority's conclusion that "duly authenticated certification" can come from a federal district court based on "duly authenticated Philippine documents, including Philippine government records," Maj. op. at 761–62 (emphasis omitted), or "any authentic Philippine documents proffered" by an applicant, *id.* at 763 (emphasis omitted); and that "executive department" can include an executive department in the Philippines.

Section 405(a)(1) waives clauses (1) and (2) of section 329(a) of the Immigration and Nationality Act, 8 U.S.C. § 1440(a), if the applicant was born in the Philippines, served honorably in active-duty status under the command of the United States Armed Forces in the Far East, or within the Philippine Army, the Philippine Scouts, or recognized guerrilla units, and "is otherwise eligible for naturalization under section 329" of the Act. Section 405(a)(2) provides that, subject to an applicant's being otherwise eligible for naturalization under section 329, in applying section 329, service in the Philippines is to be considered to be "honorable service in an active-duty status in the military, air, or naval forces of the United States." Section 329(b)(3)—which is not waived and on which the applicant's eligibility is expressly conditioned—provides that military service "shall be proved by a duly authenticated certification from the executive department under which the petitioner served." 8 U.S.C. § 1440(b)(3).

Even if the phrase, "executive department under which the petitioner served," may reasonably be read to include an executive department in the Philippines, as Almero argues, it may also reasonably be read as the INS suggests, to mean an executive department of the United States. Because a Filipino serviceman or guerrilla could have simultaneously served *in* the Philippine armed forces and *under* the United States Armed Forces, it is not necessary to equate "the executive department *under* which [the applicant] served" with the executive department *in* which he served, as the majority does. Further, § 101 of Title 5 of the United States Code lists "executive departments." There is no precedent for construing "executive department" in IMMACT differently from every other place it appears in the United States Code.

Nor does it appear unreasonable for the INS to require a "duly authenticated certification" from the executive department under which the service was performed, as the statute prescribes. Filipinos who served in the United States armed forces have long satisfied this requirement by submitting a Form N–426, Certificate of Military or Naval Service, with their Application for Naturalization. 8 C.F.R. § 329.4 (1993). Under the majority's interpretation, when records of service can't be located at the records center in St. Louis, it is okay for a "factfinder"—instead of an "executive department"—to evaluate documents and make a determination—instead of "a duly authenticated certification"—whether the applicant served in active duty. Maj.Op. at 762–63. While this may be felicitous, it does not square with the statute and is not the only possible reasonable construction.

"[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. The INS's interpretation—that military service can only be proven by a "duly authenticated certification" from the United States Army—is a permissible and reasonable one even if it is not the best one or the one this court might choose in the absence of a prior administrative interpretation. *United States v. 313.34 Acres of Land,* 923 F.2d 698, 701 (9th Cir.1991). I therefore respectfully dissent.